**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 22-35-2** |
| **KRAY STRANGE** | **:** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Kray Strange, already a repeat hands-on sex offender at just 20 years old, stands before this Court for sentencing for his convictions for manufacturing child pornography and conspiracy to manufacture child pornography, arising out of an elaborate child exploitation catfishing scheme that he developed with a local Philadelphia middle school teacher, Andrew Wolf, to entice Wolf's own middle school students and other child victims to self-produce images of themselves engaged in sexually explicit conduct. Strange and Wolf carried out this scheme for nearly a year and a half by impersonating minor girls online to entice their boy victims. In addition to Wolf's students, Strange targeted hundreds of other minor boys online and was especially interested in victimizing boys with large social media followings, such as Little League World Series players, children of political figures, and child Tik Tok stars. Strange also targeted boys he knew in real life, such as his college roommates' younger brothers, family friends, and former high school classmates, demonstrating a unique level of sadism and deceit.

As a young adult, the defendant became entrenched in the dark world of child exploitation, developing relationships with other offenders on the platform Telegram and escalating to victimizing children on a near daily basis in the 18 months leading up to his arrest on January 5, 2022. He began committing the instant offenses less than one month after "successfully" completing court-ordered sex offender treatment, unmotivated or incapable of

changing his predatory behavior against minor boys, despite having had the benefit of treatment in the juvenile justice system.  He continued offending even after learning of Wolf's federal arrest in October 2021, undeterred by his associate's arrest.  He went to great lengths to conceal his own conduct from authorities— deleting evidence from his cell phone, running an eraser program to scrub his devices of artifacts of child pornography, and seeking advice from another Telegram associate with whom he regularly communicated about their shared sexual interest in minor boys.

The defendant's Sentencing Guideline range in this case calls for a sentence of life imprisonment; but the statutory maximum sentence is 210 years' (2,520 months) imprisonment, so that becomes the effective guideline range.  The government seeks a sentence of 35 years' imprisonment to be followed by a lifetime period of supervised release.  The recommended sentence represents a downward variance from the guideline range because the government considers the defendant's Autism Spectrum Diagnosis (ASD) to be a mitigating factor.  The government also submits that the defendant should receive a lesser sentence than his co-defendant, Andrew Wolf, based on their relative culpability in this case.  On February 16, 2023, this Court sentenced Wolf to a term of 366 months' (nearly 39 years') imprisonment.  Despite these mitigating factors, the defendant has earned himself a lengthy sentence of 35 years' imprisonment to be followed by a lifetime period of supervised release through his egregious conduct and the scope of his child exploitation activities, particularly in light of his history of committing hands-on sex offenses against children.

## I.     PROCEDURAL BACKGROUND

On December 17, 2021, the Honorable Marilyn Heffley, United States Magistrate Judge,

Eastern District of Pennsylvania (EDPA), issued a federal complaint and warrant charging Kray

Strange with manufacture and attempted manufacture of child pornography, in violation of 18

U.S.C. § 2251(a), and distribution and attempted distribution of child pornography, in violation

of 18 U.S.C. § 2252(a)(2).  The complaint and warrant for Strange was issued after FBI

Philadelphia identified Strange as "Alex ibhjl" (hereinafter "Alex"), the co-conspirator of

Andrew Wolf, a former teacher at Springside Chestnut Hill Academy (SCH), who was arrested

by the FBI for child exploitation crimes after the execution of a federal search warrant at his

residence on October 7, 2021.  At the time of Wolf's arrest, law enforcement only was aware that

Wolf had uploaded child pornography to his Dropbox account in July 2021 and had purchased

images of child pornography from one child; however, a search of Wolf's cell phone revealed

that he was committing far more serious crimes than initially known to law enforcement,

including against his own middle school students.  In reviewing **over 4,000 pages** of Telegram

communications between Wolf and "Alex," the FBI learned of Wolf and "Alex's" catfishing

scheme that they developed to victimize Wolf's own students, along with hundreds of other

minor boys.  Throughout nearly 18 months of Telegram communications, "Alex" provided Wolf

with several identifying details about himself, which enabled the FBI to identify "Alex" as Kray

Strange, a then 19-year-old man living in Carthage, New York.

On January 5, 2022, Strange was arrested outside his place of employment in Carthage on

the strength of the federal complaint and warrant issued by Judge Heffley in EDPA.  On the

same day, the FBI served federal search warrants at Strange's residence, his parents' residence,

and for his person, and seized several electronic devices belonging to Strange.  Strange appeared

before a federal magistrate judge in the Northern District of New York and was removed to
EDPA.

On February 3, 2022, a federal grand jury in EDPA returned an eight-count indictment
against defendants Wolf and Strange, charging them with conspiracy to manufacture child
pornography, in violation of 18 U.S.C. § 2251(a) (Count One), and seven counts of manufacture,
attempted manufacture, and aiding and abetting and willfully causing the manufacture of child
pornography, in violation of 18 U.S.C. §§ 2251(a) and 2 (Counts Two through Six and Eight).
(Wolf was charged independently with an additional count of manufacture and attempted
manufacture of child pornography in Count Seven).

On June 23, 2022, the defendant entered an open guilty plea to Counts One through Six
and Eight of the Indictment.  There is no guilty plea agreement with the government.  On the
same day, co-defendant Wolf also entered an open guilty plea to the Indictment.  On February
16, 2023, this Court sentenced Wolf to a total of 366 months' imprisonment, to be followed by 5
years of supervised release, a $50,000 fine, a $40,000 JVTA (Justice for Victims of Trafficking
Act) Assessment, a $150,000 AVAA (Andy, Vicky, and Amy Child Pornography Victim
Assistance Act) Assessment, and an $800 special assessment.  This Court deferred a hearing on
restitution for Wolf.

A sentencing hearing is scheduled for defendant Strange on March 31, 2023.

## II.    FACTUAL BACKGROUND

Between May 2020 and October 7, 2021, Kray Strange and Andrew Wolf operated an
elaborate online child exploitation catfishing scheme to entice minor boys to self-produce
sexually explicit images and send them, primarily to Strange, but sometimes to Wolf, over the
Internet.  Strange and Wolf communicated on the end-to-end encrypted social media messaging

application Telegram nearly every day from at least as early as May 2020 until the date of Wolf's arrest on October 7, 2021. Their early messages indicate that Strange first contacted Wolf after reading Wolf's short stories on the erotic fiction website nifty.org, where Wolf, under the penname "Owen Davis," posted stories that often portrayed adult men raping minor boys. Throughout their communications, Strange lied to Wolf about his own age, presenting himself as a 16-year-old boy, despite the fact that he was already an adult when he first contacted Wolf.

In their early communications, Strange talked openly to Wolf about Strange's efforts in "catfishing" or "baiting" (i.e., impersonating someone online to manipulate or trick another person to obtain sexually explicit images and videos), and Strange was very successful in his efforts. Strange utilized several aliases that depicted him as a minor female— "Alex Zampini" or "Leslie Hansen," depending on the scenario, and he sometimes used his gender-neutral alias "Alex" as a minor boy to target gay boys for victimization. Strange talked to Wolf about specific minors he was targeting, then shared image and video files of these minors. Among other victims, Strange aspired to victimize minor boys with large online followings. Based on his statements to Wolf, Strange also targeted boys he knew, such as his college roommates' younger brothers, family friends, and former high school classmates. Based on the review of Strange and Wolf's Telegram communications, Strange exploited over 200 victims whose sexually explicit images he shared with Wolf.

Strange used his minor girl personas to target boys primarily on Snapchat. He enticed the boys to self-produce and send him sexually explicit images by distributing images of minor girls engaged in sexually explicit conduct, which Strange claimed were pictures and videos of Alex/Leslie, and sometimes by engaging the boys in games of "Truth or Dare." Strange also provided his victims with specific instructions about the kinds of pictures and videos he wanted,

often asking Wolf for suggestions.  Beginning around July 2020, Wolf and Strange started discussing Strange catfishing (or "baiting") Wolf's own minor boy students at SCH.  Strange first suggested the idea to Wolf:

| Strange: | Do you have any boys you want me to bait? |
|---|---|
| Wolf: | Like my students u mean? |
| Strange: | Any boy.  I'd even try ur nephews if you got info for it … |
| Wolf: | I've messaged like 8 of my students and 0 have ever written back … |
| Strange: | Can I try now? |
| Wolf: | No I'd let u try one of my students though as soon as you send that vid of yourself |

In early August 2020, Wolf began providing Strange with known social media handles for some of his students, and Strange also located some students on social media on his own. Strange also independently located potential victims at nearby schools in Lower Merion and at Episcopal Academy, and suggested these boys to Wolf as child victims to target.  Ultimately, in January 2021, Wolf provided Strange with a detailed spreadsheet of 78 students he wanted Strange to target, which greatly assisted Strange in his efforts.  Using the spreadsheet, Wolf and Strange maintained a tally of their communications and successes, which included notations such as "Got him" and "Got his d," followed by exclamation points and emojis.  Via Telegram, Wolf provided Strange with specific instructions to pass along to the victims regarding the sexually explicit images he wanted his students to create.  Strange also gave victims his own instructions about how to pose and what to do--- for example, suggesting that they insert their fingers and objects into their anuses, measure their penises with a ruler, telling a victim that the boy would be his "slave" who had to do whatever he asked of him, and asking a victim to record himself

- 6 -

"jerking off" while saying another boy's name.  Wolf also assumed a fictitious online minor girl persona, "Ashley Hamilton" and, on occasion, once Strange had built a rapport with the victims and was already receiving sexually explicit images from them, Strange would introduce the victims to "Ashley" online and facilitate Wolf's direct participation in the communication.

The FBI seized Wolf's cell phone, among other electronic devices, after executing a federal search warrant at his residence in Philadelphia on October 7, 2021.  A review of Wolf's cell phone uncovered the development and execution of his and Strange's scheme to catfish Wolf's students.  The evidence of Wolf and Strange's scheme comes primarily from the Telegram communications that were extracted from Wolf's cell phone at the time of his arrest and corroboration from victim interviews.  Their Telegram communications amount to over 4,200 pages containing over 27,000 messages, including image and video files.  Of approximately 4,000 image files exchanged between Wolf and Strange, many of the files now appear as "empty" files, meaning they were deleted by one of the parties in the chat, and the content cannot be retrieved.  From the approximately 500 image files exchanged between Wolf and Strange that were retrieved, about half of those— approximately 250 image files— clearly depict child pornography.  The vast majority of these images were sent by Strange to Wolf, although Wolf also occasionally sent Strange child pornography.

In addition to the victims charged in this Indictment, Strange and Wolf discussed other minors Strange was targeting and shared image and video files of these minors.  Within the Telegram communications, Strange and Wolf also discussed other associates with whom they communicated on Telegram regarding their child exploitation activities and with whom they traded child pornography.  In the same way the FBI extracted the communications between Wolf and Strange from within the Telegram application on Wolf's cell phone, the FBI obtained

communications between Wolf and several other perpetrators, including, among others, an individual who purports to be a youth baseball coach and a teacher and youth hockey coach.[1] Based on these communications, it is clear that Strange also communicated with the youth baseball coach and the teacher/youth hockey coach and offered his "baiting" services to these offenders.  The FBI also obtained a Telegram "group chat" communication between Wolf, Strange, and another offender, during which they discussed Strange's "baiting" of minor boys and traded child pornography.

On January 5, 2022, the FBI arrested Strange pursuant to a federal complaint and warrant. From his person, agents seized a OnePlus Android smart phone.  Notifications could be seen on the lock screen, including notifications from Telegram and Discord, but the content could not be viewed because the phone was locked.  The phone was searched pursuant to a federal search warrant.  *See* Exhibit A, attached, documenting the FBI's forensic review of Strange's cell phone.  The Telegram application was active on Strange's phone, and contained chats with **more than 10,500 other participants,** almost exclusively related to the trading of child sexual abuse material, the discussion of shared sexual interests in minor boys, and "baiting" or catfishing minor boys to produce child pornography.  Notably, these communications *post-dated* Wolf's arrest on October 7, 2021 because Strange deleted his communications after Wolf's arrest, changed his Telegram username from "Alex" to "New Kne," and used an eraser application on his cell phone to destroy evidence and attempt to conceal his activities from law enforcement.

---

[1] This Telegram associate, "Mr. Pickles," was identified through a lead generated out of FBI Philadelphia as Daniel Dasko, an elementary and middle school teacher and youth hockey coach in San Diego, California.  Dasko has been charged in the Southern District of California.  PSR ¶ 95.

On October 14, 2022, Strange told another Telegram associate, "Garfield"[2] that after his "friend's" (Wolf's) arrest, he deleted his own accounts to protect himself, used an eraser application to try to get rid of any artifacts of deleted content on his phone, and was scared of being identified as his "friend's" partner in their scheme.

Strange's cell phone contained at least 280 images and 60 videos of child pornography. These files depicted minor boys engaged in sexual activity, including anal sex, oral sex, masturbation, and exposing their genitals. Some of the victims depicted were as young as approximately 5 years old. These files included 18 videos of Minor 7 engaged in sexually explicit conduct, as well as images depicting other identified victims who were 2021 Little League World Series participants. Strange's phone also contained approximately 2,500 images and 900 videos of child erotica; these videos and images appear to depict minors engaged in sexual activity, as well, but the age of the victims has not been confirmed.

## III.   SENTENCING CALCULATION

### A.   Statutory Maximum Sentences

**Manufacturing/attempted manufacturing/conspiracy to manufacture child pornography, 18 U.S.C. § 2251(a)(1) (Counts One through Six and Eight):** 30 years' imprisonment with a 15-year mandatory minimum term of imprisonment, a mandatory minimum 5 years of supervised release up to a lifetime of supervised release, a $250,000 fine, a $100 special assessment, mandatory restitution

---

[2] "Garfield" was identified through a lead generated out of FBI Philadelphia as James Bowers, Jr., an operational technology systems analyst in Hudson Valley, New York. Bowers has been charged in the Eastern District of New York. PSR ¶ 96. The extracted Telegram communications between Strange and Bowers occurred between October 14, 2021 and January 5, 2022, during which time Strange and Bowers exchanged approximately 8,585 messages. Among other topics related to their shared sexual interest in children, trading of child pornography, and Strange's prolific "baiting" efforts, they discussed how Strange should respond after learning of Wolf's arrest. In October 2021, just a few weeks after Wolf's arrest, Strange told Bowers that he already used an eraser application on his phone, was planning to obtain a new cell phone, and was debating deleting his Snapchat accounts. Strange distributed sexually explicit images of Minor Victim 7 (one of Wolf's students) to Bowers, among other images of child pornography.

pursuant to 18 U.S.C. § 2259 of at least $3,000 per victim, and if found to be non-indigent, an additional mandatory $5,000 special assessment must be imposed pursuant to 18 U.S.C. § 3014, and up to $50,000 in additional assessments may be imposed pursuant 18 U.S.C. § 2259A, on each count.

**TOTAL MAXIMUM PENALTY**: 210 years' imprisonment with a mandatory minimum term of 15 years' imprisonment, a minimum 5 years up to a lifetime of supervised release, a $1,750,000 fine, mandatory restitution of at least $3,000 per victim, a $700 special assessment, and if found to be non-indigent, an additional, mandatory $35,000 in special assessments must be imposed pursuant to 18 U.S.C. § 3014, along with up to $350,000 in additional assessments under 18 U.S.C. § 2259A.

### B.   Sentencing Guidelines Calculation

The government agrees with the Probation Office's calculation of the defendant's advisory Sentencing Guideline range, outlined in PSR Paragraphs 104-161.

With a Criminal History Category I and final offense level of 43, the advisory Guideline range is life imprisonment, but the effective Guideline range is 2,520 months' (210 years) imprisonment, which is the statutory maximum sentence.  PSR ¶ 215.

## IV.   SENTENCING ANALYSIS

A thorough consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a 35-year prison sentence to be followed by a lifetime period of supervised release is warranted.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to

criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to

provide the defendant with educational or vocational training, medical care, or other correctional

treatment in the most effective manner; (5) the guidelines and policy statements issued by the

Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct; and (7) the need

to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

### A.    Consideration of the 3553(a) Factors

#### 1.   The nature and circumstances of the offense

The production of child pornography is undisputedly a grave offense.  As the Supreme

Court has explained, "[c]hild pornography harms and debases the most defenseless of our

citizens.  Both the State and Federal Government have sought to suppress it for many years, only

to find it proliferating through the new medium of the Internet."  *United States v. Williams*, 553

U.S. 285, 307 (2008).  Congress, too, has explained the difficulties in successfully combating the

"immense" problem of child pornography and the "rapidly-growing market" for such materials,

which is fueled by new technologies that were largely unavailable when the Sentencing

Guidelines were first promulgated. *See S. Rep. No. 108-2 (2003).*  Indeed, Congress has

repeatedly expressed its dismay about the "excessive leniency" of federal sentences, *see H. Rep.*

*No. 108-66; S. Rep. No. 104-358*, especially in light of the continuing harm caused to the

children appearing in such materials, as well as the inflammatory effect it has on the "desires of

child molesters, pedophiles, and child pornographers," which results in a robust and growing

market for child pornography and, therefore, increased abuse of innocent children.  *See Child*

*Pornography Prevention Act of 1996,* Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26, 27

(1996), codified at 18 U.S.C. § 2251 note; *United States v. MacEwan*, 445 F.3d 249, 250 (3d Cir.

2006); *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998). The Supreme Court has clearly recognized the harm to these children, noting that the "materials produced are a permanent record of the children's participation…" in the abuse. *See New York v. Ferber*, 458 U.S. 747, 759 (1982); *Osborne v. Ohio*, 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come.").

Here, the defendant committed these offenses beginning just one month after completing court-ordered sex offender treatment for hands-on sex offenses that he committed as a juvenile. Despite undergoing more than one year of sex offender treatment focused on "taking responsibility for his offense and addressing thoughts and feelings that may contribute to behaviors that support sex offenses" and having court-ordered restrictions placed on his contact with minors and his access to the Internet, PSR ¶ 194, the defendant reoffended by victimizing hundreds of minor boys on the Internet.

By the time Strange began communicating with Wolf on Telegram in May 2020, he already fancied himself to be a prolific "baiter," very talented at pretending to be a child himself in order to deceive boys into producing sexually explicit images of themselves and send them to him on the Internet. In fact, Strange first suggested the idea of "baiting" his students to Wolf. [3] While the government views Wolf as more culpable than Strange, Wolf almost certainly would not have been successful in preying on his own students without Strange's assistance. When boys resisted the initial online contact by Wolf and Strange by not responding at all or by cutting off communication when things turned sexual, Strange persisted by resuming communication

---

[3] *See* attached **Exhibit B, to be filed under seal,** for a selection of Telegram chats between Strange and Wolf. This selection includes the chats referenced in this memorandum that were not part of the change of plea memorandum.

with the boys after some downtime.  Strange also suggested other potential victims to Wolf, including students who attended other schools in the Philadelphia area.  He also located some of Wolf's students online on his own, including Minor 4 on March 8, 2021, to which Wolf responded that Minor 4 was not even on his spreadsheet.  Shortly thereafter, Strange and Wolf convinced Minor 4 to record himself engaged in sex acts with another boy.  For Strange, convincing the boys to record themselves together was reminiscent of another occasion when he successfully escalated his exploitation of two 13-year-old boy cousins, convincing them to perform oral sex on each other.

Strange also provided his own instructions to many of the victims as to how he wanted them to pose.  For example, while communicating with Minor 3, he convinced the boy to be his "slave" and measure his penis with a ruler, in addition to creating other images suggested by Wolf.  Strange engaged in sextortion of Minor 3, threatening to "leak" his images to Minor 3's social media followers unless Minor 3 sent more.  On March 8, 2021, Strange sent Wolf an unsolicited video of Minor 4 with the description: "I told [Minor 4] to jerk off for someone he would go gay for."  On May 11, 2020, Strange told Wolf the following about Minor 8: "I told him to go deeper [inserting his fingers in his anus]… Finger ur hole while u jerk off till u cum and moan for me. Latest instructions."

In addition to Wolf's students, Dasko's students, and other boys selected by his Telegram associates, the defendant had a particular fascination with targeting boys who were talented athletes, especially those involved in the Little League World Series, and other boys with large social media followings, such as child Tik Tok stars and the children of political figures.  These were children of whom Strange was envious and whom he wanted to hurt by sexually exploiting them-- pushing their boundaries, humiliating them, and sometimes threatening them, all the

while making them believe they were communicating with a similarly aged, attractive girl. Strange also targeted other boys, including some he knew in real life. For example, in September 2021, he told Wolf that he had three college roommates, two of whom had younger brothers that he intended on baiting. On another occasion, Strange told Wolf that he had successfully baited his own 16-year-old cousin. On February 14, 2021, Strange told Wolf that he had added two family friends— boys ages 14 and 16— on social media for the purpose of "baiting" them while Strange sat in the same room as them with all of their parents for a family dinner. Later, on August 16, 2021, Strange expressed sexual interest in an 11-year-old neighbor, telling Wolf, "This 11 yo neighbor boy is gonna make me do something I regret."

Strange also revictimized some of the children by redistributing their sexually explicit images to other offenders and, on occasion, to other children. Strange viewed 14-year-old Minor 7 as particularly attractive, masculine, and popular, and he redistributed sexually explicit images of Minor 7 as if they were himself in an attempt to bait gay boys, telling Wolf on February 7, 2021: "I'm baiting a gay boy as [Minor 7's last name]." Similarly, on June 17, 2020, Strange gave Wolf advice about how to use Minor 8's images to bait gay boys and told Wolf that he was creating a new account to pretend to be Minor 8 in his own communications with other potential victims. Strange later distributed images and videos of Minor 7 to his Telegram associate "Garfield." [4]

Strange's involvement in the child exploitation world also extended beyond his relationship with Wolf. He communicated with dozens of other sex offenders on Telegram, and

---

[4] *See* attached **Exhibit C, to be filed under seal,** for a selection of Telegram chats between Strange and "Garfield." This selection includes the chats referenced in this memorandum that were not part of the change of plea memorandum.

was undeterred by Wolf's arrest.  Rather than stop his criminal behavior, Strange deleted evidence, wiped his cell phone, and changed his Telegram name and other account names to continue baiting minor boys and communicating with other offenders about their shared sexual interest in children.  For example, on October 18, 2021, after Wolf's arrest, Strange's associate "Garfield" asked him, "So what are you doing about baiting?  Stopping completely?  Just gonna take a break for awhile?" to which Strange responded, "I'm just not saving anything… maybe when I get a new phone that can run calyx os [an Android operating system designed to "defend online privacy, security, and accessibility"][5]… when I save enough I'm getting a pixel 6 pro and then I'll send."  Following this exchange, Strange sent Garfield a series of videos and images depicting a minor boy engaged in sexually explicit conduct.

The crimes charged in this Indictment only scratch the surface of the defendant's involvement in the child exploitation world.  The defendant also exploited hundreds of other children on the internet with his co-defendant, with other sexual predators in his online community, and on his own.  The defendant traded child pornography with other offenders on the platform Telegram starting at least as early as May 2020 and did so on a near daily basis until the time of his federal arrest, often spending most of the night communicating with his Telegram associates rather than sleeping or doing anything else productive.  To further his efforts, Strange sometimes took time off from baiting and trading boys' images to seek out "new" sexually explicit images of minor girls that he could redistribute as "Alex" or "Leslie," creating yet another set of child victims in this case— the young girls that Strange revictimized by downloading and distributing the images of their abuse on the Internet.

In addition to Telegram, Strange had several other accounts with applications used

---

[5] *See* "About the Calyx Institute – Calyx Institute," at calyxinstitute.org.

primarily, if not exclusively, for obtaining child exploitation material by "baiting" boys, and he often freely discussed these other platforms with his Telegram associates. On these platforms, Strange used his minor teenage girl personas "Alex" and "Leslie" to identify himself, including on Discord, Snapchat, Instagram, and Google. Strange often recommended other social media platforms and child pornography sites to Wolf and sometimes gave Wolf instructions on how to create accounts. For example, on one occasion, Strange asked Wolf if he was familiar with "Periscope," which Strange described as the "livestream unmonitored Twitter," and walked Wolf through the steps to make an account. Similarly, on August 12, 2021, Strange taught Wolf how to use the social media application Discord, another site on which Wolf and Strange obtained child pornography and catfished young boys.

During 2020 and 2021, the defendant's school-age victims[6] were made even more vulnerable by the Covid-19 pandemic. They were in virtual school, isolated from in-person association with most of their friends and those in their peer group. Like most of society, they were using the Internet to communicate with their friends and loved ones outside of their nuclear families. Use of the Internet to meet friends was normalized, and many of the defendant's victims believed they were communicating with a similarly aged girl who was the friend of a friend. The defendant manipulated his victims and preyed upon this vulnerability, as well as the fact that his intended victims were young teenage boys going through puberty who would respond to positive attention from an attractive girl their same age. Strange prided himself on

---

[6] The government expects some of the victims' parents to attend the sentencing hearing, at which time they may choose to address the Court and provide victim impact testimony. The government has also received some written victim impact statements, attached here as **Exhibit D to be filed under seal.** Should the government receive additional written statements in advance of the sentencing hearing, they will be forwarded to the Court and counsel to be included as part of Exhibit D.

being smarter than his child victims and was sexually gratified by the imbalance in intelligence, describing himself to Wolf on August 18, 2020 as "pan-sapio selective sexual"-- someone whose "dominant side" in a submissive-dominant relationship is "really brought out by younger cute guys" who he "enjoy[s] being smarter than."

### 2. The history and characteristics of the defendant

The defendant is 20 years old and has been incarcerated since the date of his federal arrest on January 5, 2022. At this young age, the defendant already has demonstrated that he *will not stop* his child exploitation crimes. He committed the instant offenses beginning just one month after "successfully" completing court-ordered sex offender treatment. Despite the intervention of New York's juvenile justice system to rehabilitate the defendant, he has not been deterred from sexually exploiting children as an adult, but instead, engaged in the online sexual abuse of children almost every single day from at least May 2020 until the time of his arrest.

In January 2018, Strange was arrested for an incident that occurred on March 11, 2017 when Strange was nearly 15 years old. While at a Mormon church event, Strange volunteered to babysit a group of younger children while the adults attended a wedding. Afterwards, a 6-year-old boy immediately disclosed to his mother that Strange had taken him into a closet and touched his penis. Although Strange was a juvenile himself at this time, he was more than twice the age of his 6-year-old victim. For this offense, the defendant received a deferred juvenile adjudication, and an order of adjournment in contemplation of dismissal was entered pending the defendant's participation in counseling and treatment under the supervision of the Juvenile Probation Department. The defendant "successfully" completed the court's requirements, and the charges were dismissed on January 16, 2019. PSR ¶¶ 168-170. Just one month later, the defendant (then age 16) sexually abused a 14-year-old boy by walking in on him in the shower

- 17 -

and groping his penis after being hired by the child's mother to perform housecleaning work at their home. The defendant was arrested for this offense on March 12, 2019 and later adjudicated delinquent for endangering the welfare of a child. PSR ¶¶ 162-163. He was placed on intensive probation and ordered to participate in sex offender treatment and counseling. He was also prohibited from having unsupervised internet access and was required to follow a court-ordered safety plan. PSR ¶ 164. Throughout his sex offender treatment, Strange had "difficulty accepting responsibility and minimized his behaviors," PSR ¶ 194, much like he continued to do with respect to the instant offenses when interviewed by the U.S. Probation Office and by the Bureau of Prisons (BOP) forensic psychologist, Dr. Robin Watkins. Strange's sex offender treatment team expressed "concerns regarding his risk of reoffending" as he "struggled with maintaining appropriate boundaries and age-appropriate relationships" and "displayed evidence of sexual preoccupation and deviant sexual preferences," especially when he was able to bypass the "external controls placed on him by his parents and (juvenile) probation" and continue to engage with online pornography. *Id.* Strange's treatment team was correctly concerned that he would reoffend— rather than changing his behavior or viewing his sexual offense contacts with the juvenile justice system as any kind of wake-up call, just one month after "successfully" completing sex offender treatment and being discharged from juvenile probation, Strange sought out Andrew Wolf on Telegram and began committing the instant offenses, undeterred from continuing to sexually exploit minor boys.

Despite admitting these offenses in juvenile court, Strange denied having committed them when interviewed by U.S. Probation and BOP's Dr. Watkins. *See* Watkins Report, 12/21/21, p. 8. When he believed he was communicating with Wolf, a fellow sexual predator, in the "safe" (end-to-end encrypted) space of Telegram, he also admitted another hands-on offense,

telling Wolf on March 21, 2021 that he previously "groped [his friend] in his sleep, but that was before he [the friend] really hit puberty."  As evidenced above, despite denying being sexually aroused by minor boys when interviewed by Dr. Watkins,[7] Report, pp. 11, 16, Strange also regularly demonstrated his sexual interest in boys through his words and actions.  He regularly masturbated to the images of sexual abuse he manipulated boys into sending him; he regularly discussed being aroused by minor boys with Wolf and his other Telegram associates.  On one occasion, for example, Strange told Wolf, "This 11 yo neighbor boy is gonna make me do something I regret… I want to fondle him so bad right now," followed by a photo of the boy that Strange took while the boy was visiting Strange's parents' house.

When interviewed by Dr. Watkins, Strange also lied about his current offense.  For example, he claimed that he typically "revealed his [true] identity [to the victims] with pictures," which prompted the boys he was exploiting to block him.  Watkins, p. 16.  There is absolutely no evidence of Strange revealing his true identity to any of the victims in this case.  In fact, Strange maintained months-long contact with many of the victims, manipulating and deceiving them as "Alex" or "Leslie" for the duration of their communications.  His process of "tricking" people was absolutely intentional, despite his statements to Dr. Watkins; "tricking" boys was the only way he could get what he wanted--- more and more sexually explicit images of the victims to gratify himself and other sexual predators.  Strange also lied to Dr. Watkins about his continued involvement in trading child exploitation material and "baiting" boys after Wolf's arrest, telling her that once "Owen" (Wolf) was gone, he stopped reaching out to new people.  Watkins, p. 16.

---

[7] Of course, this denial is yet another example of Strange's minimization of his own sexually deviant behavior in an attempt to manipulate the psychological evaluation in his favor, and Strange admitted to the Probation Officer in July 2022 (prior to his BOP evaluation) that he did, in fact, feel sexual satisfaction from interacting with his victims.  PSR ¶ 102.

Of course, this statement is belied by the communications with Garfield, a sampling of which is attached as Exhibit C, and the evidence of his communications with over 10,000 participants on Telegram that post-date Wolf's arrest, as documented in Exhibit A. The defendant's denials, minimizations, and blatant lies should alarm this Court as they demonstrate that Strange has not taken full responsibility for his actions, does not recognize the motivations driving his criminal behavior, and continues to try to manipulate and deceive mental health professionals and this Court when he thinks he can get away with it.

　　　　　　a. *The Defendant's Autism Spectrum Diagnosis*

　　　　While the government has not yet received a sentencing memorandum from the defense, the government expects that the defense will seek a downward variance at sentencing based on the defendant's autism spectrum diagnosis (ASD). The government has given due consideration to this factor, which is the primary reason the government is recommending only a 35-year sentence. However, the defendant has never demonstrated a commitment to his own mental health treatment or sex offender treatment and has previously lied about or exaggerated the limitations on his cognitive and social abilities to benefit himself.[8] For nearly 18 months, Strange engaged in manipulative and deceitful behavior to get what he wanted from child victims and continued communication with his online network of other sexual predators even after Wolf's arrest. He knew what he did was wrong and criminal, and he went to great lengths to conceal his conduct from law enforcement after Wolf's arrest by deleting evidence from his cell phone.

---

[8] *See* Watkins Report, at p. 3: Strange appears to "potentially exaggerate reports of psychological symptoms and to minimize reports of inappropriate sexual behavior." He also "appears to enjoy being the subject of the evaluation," *id.* at p. 17, i.e., he enjoys being the center of attention. Strange "tends to over-report or over-emphasize concerns, potentially in an attempt to garner the attention for which he yearns." *Id.* at p. 22.

An Autism Spectrum Disorder diagnosis should not be used as a blanket mitigating factor in child pornography cases. Autism Spectrum Disorder refers to a broad range of conditions characterized by persistent deficits in social communication and restricted, repetitive patterns of behavior. *See* American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013) ("DSM-5"). An ASD diagnosis has been used as a defense in several child pornography cases, in which defendants have claimed that their ASD symptoms contributed to the commission of the offenses and their failure to understand their wrongdoing. Courts, however, have generally not found a defendant's ASD diagnosis to be a basis for a downward departure from sentencing guidelines. *See United States v. Zuk*, 874 F.3d 398, 409 (4th Cir. 2017) (a 90% departure from the advisory guidelines due to the defendant's ASD was substantively unreasonable); *United States v. Lange*, 445 F.3d 983, 986 (7th Cir. 2006) (affirming district court's decision to not apply a downward departure based on ASD-caused diminished capacity); *United States v. Alferez*, 2014 WL 2002883 at *12 (W.D. Texas, May 14, 2014) ("A downward departure is not warranted in child exploitation cases where the defendant suffers from a mental illness, whether as a result of childhood sexual abuse or otherwise, or even where a psychologist examines the defendant and concludes that he or she is unlikely to reoffend."). Since ASD rarely meets the requirements for a downward departure, it is no surprise that defendants have shifted to arguing that, instead, their ASD diagnosis should be a mitigating factor pursuant to the § 3553(a) factors.

Stating that someone with ASD cannot understand the criminality of child pornography or the gravity of sexually exploiting children, whether online or in person, is a misapplication of psychology. Autism is a *spectrum* disorder, and the "constellation of maladaptive characteristics" blend together differently and range from mild to severe in an individual

diagnosed with ASD.  *See* Roberta Schriber, Marjorie Solomon, and Richard Robins. *Personality and Self-Insight in Individuals with Autism Spectrum Disorder*, JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY, 112-130 (2014).  A description of general characteristics of those with Autism Spectrum Disorder cannot replace an individualized assessment of the severity of ASD symptoms in a particular defendant and whether his symptoms affected his criminal behavior. *United States v. Geanakos*, 2017 WL 374351 at *5-6 (E.D. Cal, Jan. 26, 2017) (expert witness report speaking mainly in generalities about autism is not reliable); *United States v. Dolehide*, 2011 WL 1812795 at *5 (N.D. Iowa, May 6, 2011) ("[T]estimony at the Hearing consisted of a series of generalities regarding Asperger's Syndrome, which the court finds unhelpful in analyzing the sentencing factors as related to this specific defendant.").  Courts must refrain from blindly deferring to the existence of an ASD diagnosis as a shortcut to determining moral culpability.  *United States v. Lange*, 445 F.3d 983, 986 (7th Cir. 2006) ("The issue . . . is not whether he suffered from a defined disorder, but whether he was impaired in his ability to control his actions.").

A defendant's behavior is far more illustrative of his understanding of his wrongdoing than an ASD diagnosis standing alone, and certain behaviors can show that even a defendant with ASD demonstrated an understanding of the illegality of child pornography and is a dangerous person.  Much like Strange's efforts to delete evidence from his phone and use an eraser program to scrub artifacts of child pornography from his device, actions of interest include encryption, selective in-private browsing only when viewing pornographic materials, and hiding child pornography under innocuous file and folder names.  Chad Steel, *The Asperger's Defense in Digital Child Pornography Investigations*, 23 PSYCHIATRY, PSYCHOLOGY AND LAW, 473, 480 (2016).  Such security countermeasures indicate that an individual has the presence of mind to

- 22 -

understand that his actions are wrong and take active steps to conceal them.  *See United States v. Shore*, Crim. No. 17-502, 2020 WL 3791550 at *3 (E.D. Pa., July 7, 2020) (Savage, J.) (Defendant diagnosed with autism communicated with a victim though private Facebook messenger after learning she was only 12 years old.)  A defendant's method of targeting his victims and acquiring the child pornography can also be evidence that, despite an ASD diagnosis, he understood the social world well enough to intentionally manipulate and groom his child victims.

Defendant Strange exhibited these behaviors and clearly understood what he was doing was wrong.  He also knew how to lie about what he was doing.  He concealed his activities from his family and roommates.  After Wolf's arrest, he went to great lengths to conceal his own involvement from law enforcement.  Strange understood the social world well enough not only to intentionally manipulate and groom his child victims, but even to joke about it with Wolf.  For example, on October 18, 2020, Strange told Wolf, "The examples [in this college assignment] include grooming… 6 hours of grooming a day… I put my grooming time down as reading," to which Wolf responded, "Hehehe.  You are one of the biggest book worms I know then."

While Strange's inability to interact successfully with his peers and his unusual social presentation can be attributed to ASD, the same cannot be said for his sexual attraction to minors.  There is no reliable data to conclude that individuals with ASD are more likely to be sexually attracted to minors than the general population, and the majority of individuals with ASD are not sexually attracted to minors.  The defendant's conversations with Wolf, his other Telegram associates, and his victims are replete with manipulative behaviors that are more consistent with general sex offenders than those with significant social deficits.

Significantly, the BOP evaluation conducted by Dr. Watkins concurred with his Autism

- 23 -

Spectrum Disorder diagnosis, but also found that the defendant is "relatively high functioning in comparison to many others who suffer from ASD" and "did not appear to be experiencing functional impairment due to any existing deficits." Watkins, pp. 23-25. Prior to his arrest in January 2021, the defendant lived on his own (with other young adult roommates he described as friends) in Carthage, New York and maintained steady employment. PSR ¶ 206. He attended one year of college after graduating high school, including one semester living independently on campus at Nicholls University in Louisiana. PSR ¶¶ 202-203. The defendant's employment history, educational history, and history of independent living all demonstrate that the defendant can abide by social norms when he wants to do so; he simply chose not to follow the laws against child sexual abuse because he had a sexual interest in children and believed he was too smart to get caught.

Dr. Watkins also found that Strange suffers from additional disorders which were connected to his crimes and his risk of recidivism: (1) Other specified anxiety disorder, and (2) **Other specified paraphilic disorder** (hebephilia), which is similar to pedophilic disorder, except that sexual fantasies, urges, or behaviors are directed toward pubescent children, typically in the adolescent age range. Watkins, p. 23. Importantly, Dr. Watkins found that Strange's current presentation is similar to those of other individuals with sex offending behavior. *Id.* Like other sex offenders, Strange "demonstrate[s] a range of deficits in the areas of emotional self-management, sexual self-regulation, deviant sexual interest, and intimacy skills" and derives satisfaction from "deceiving others into interacting with him." *Id.*

Furthermore, the defendant attempted to manipulate the BOP evaluator by exaggerating his ASD symptoms and minimizing his culpability in this case and with respect to prior reports of sexual abuse. This should cause this Court great concern. The defendant has been given

- 24 -

numerous opportunities to seek help, change his behaviors, and cease his contact with children, but time and again he engaged in crimes against children from his mid-teens into young adulthood, stopped only by his arrest and incarceration in this case.  His lies and manipulation continued even after his incarceration to the BOP evaluator, at a time when Strange should have been the most forthcoming.  This speaks volumes about Strange's willingness and capability to adhere to the laws against child sexual abuse when he is released from prison.

### b.  The Defendant's Self-Reported History of Sexual Abuse

The government also anticipates that the defendant may seek a downward variance based on his self-reported history of sexual victimization, disclosed for the first time to the pre-sentence investigator.  A request for a variance on this ground should be denied.  Research has shown that sexual perpetrators tend to fabricate claims of childhood sexual abuse in an effort to mitigate their sentences,[9] so the defendant's new claims of childhood abuse must be examined with a critical lens.  Evidence of duplicity by sex offenders can be found in numerous studies.  One such study found that 67% of sex offenders initially reported experiencing sexual abuse as children, but when subjected to a polygraph, the proportion dropped to 29%, evidencing that *more than half* of those who claimed prior abuse were dishonest in their report.[10]  Though "prior victimization may have some effect in a minority of perpetrators . . . [a]nother possibility is that

---

[9] *See e.g.,* Ryan Hall & Richard Hall, *A Profile of Pedophilia: Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues,* 82 MAYO CLINIC PROCEEDINGS 457, 464 (2007) (There is "legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused as children themselves. These statements are often made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior.").

[10] Jan Hindman & James M. Peters, *Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders*, 65 FEDERAL PROBATION 8 (2001).

some sexual perpetrators may feign sexual victimization in order to gain sympathy, preferential treatment, or therapy."  Martin Glasser et al., *Cycle of Child Sexual Abuse: Links Between Being a Victim and Becoming a Perpetrator*, 179 BRITISH J. PSYCH. 482, 488 (2001).  In a more recent study of 38,000 male offenders, "contrary to findings typically reported in retrospective clinical studies, proportionally few sexual offenders (4%) had a confirmed history of sexual abuse."[11] Indeed, though some may believe that those who were sexually abused as children grow up to become offenders themselves, research does not fully support the existence of such a relationship.  Studies have found that the link between childhood sexual abuse and future offending is far from inevitable. *See* Ian Lambie et al, *Resiliency in the Victim-Offender Cycle in Male Sexual Abuse,* 14 SEX ABUSE 31, 43 (2002) ("The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend.  However, there are serious limitations to this explanation…); Malory Plummer & Annie Cossins, *The Cycle of Abuse: When Victims Become Offenders*, 19 TRAUMA, VIOLENCE & ABUSE 286, 286 (2018) ("Various psychological theories exist in the literature to explain the behavior of men who commit child sex offences, including the belief that child sexual abuse (CSA) is a predisposing factor for the transition from victim to offender.  These theories are, however, unable to explain the fact that while most victims of CSA are female, most perpetrators of CSA are male.").[12]  In fact, individuals who are victims of childhood sexual abuse often demonstrate

---

[11] Chelsea Leach, Anna Stewart & Stephen Smallbone, *Testing the Sexually Abused-Sexual Abuser Hypothesis: A Prospective Longitudinal Birth Cohort Study*, 51 CHILD ABUSE & NEGLECT 144, 144 (2016).

[12] For other studies that have found limited evidence of a "cycle" of sexual abuse from victim to offender, *See* Cathy S. Widom & Christina Massey, *A Prospective Examination of Whether Childhood Sexual Abuse Predicts Subsequent Sexual Offending Online Only*, 169 JAMA PEDIATRICS 1 (2015), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2086458 ("Childhood sexual abuse has been

*continued . . .*

extreme resilience and hold strong empathy for those who have been sexually abused as children, making them *less likely* in adulthood to sexually abuse and exploit children.

Regardless of the veracity of the defendant's new claims of childhood abuse, it does not excuse, justify, or mitigate his crimes in this case. In *United States v. Yard*, 558 Fed.Appx. 231, 237 (3d Cir. 2014), the District Court's refusal to grant downward variance based on the defendant's molestation as a child was upheld by Third Circuit as reasonable. The District Court explicitly addressed the defendant's background, which included being a victim of molestation (an argument that was emphasized by the defendant and his witnesses during the sentencing hearing), and concluded, "I cannot excuse anything in the defendant's background as having any weight with me in terms of what sentence I should impose in this case," and later again noted, "I just can't excuse what the defendant said happened to him or what his thoughts were or what his challenges were...."). The District Court also added that defendant Yard was "not atypical" of child pornography defendants in that he had no prior record, a good education, and a family ignorant of his crimes. *Id.*, at 237-38. *See also United States v. Vela*, 927 F.2d 197, 199 (5th Cir. 1991) ("Childhood abuse and neglect are often present in the lives of criminals. They always affect their mental and emotional condition. ... 'We simply cannot agree, therefore, that these are the kinds of considerations which warrant substantial reductions in guidelines

---

assumed to increase the risk for sexual offending. However, despite methodological limitations of prior research, public policies and clinical practices have been based on this assumption."); Tracy Thomas & William Fremouw, *Moderating Varibeles of the Sexual "Victim to Offender Cycle" in Males*, 14 AGGRESSION & VIOLENT BEHAV. 382 (2009); Daniel Salter et al., *Development of Sexually Abusive Behavior in Sexually Victimized Males: A Longitudinal Study*, 361 THE LANCET 471 (2003) (finding that the majority of victims do not go on to perpetuate abuse themselves); Ashley F. Jespersen et al., *Sexual Abuse History Among Adult Sex Offenders and Non-Sex Offenders: A Meta-Analysis*. 33 CHILD ABUSE & NEGLECT 179, 190 (2009) (sexual abuse history is neither a sufficient nor a necessary condition for adult sexual offending.").

sentences.'") quoting *United States v. Daly*, 883 F.2d 313, 319 (4th Cir. 1989) (internal citation

omitted); *United States v. Brady,* 417 F.3d 326, 334 (2d Cir. 2005) (finding that "because it is the

sad fact that so many defendants have unfortunate pasts," there is a high standard of what

constitutes an atypical case that would merit a sentencing departure). Similarly, here, the

defendant has offered nothing that sets his case apart as sufficiently "atypical" to warrant a

mitigated sentence on this ground. The defendant's reports of sexual abuse cannot be proven,

nor can they be rebutted. If true, the defendant's victimization as a child does not justify or

excuse his crimes today. Any motion for a variance on this ground should be denied.

### c.  *Defendant's First Adult Conviction*

Though this is the defendant's first adult criminal conviction, he has already

demonstrated a pattern of sexual offending against children by exploiting multiple victims in this

case and by his prior hands-on offenses committed as a juvenile. The Guidelines already reflect

the fact that the defendant has no prior adult criminal record. He should not now receive any

additional consideration for this reason. See *United States v. Borho,* 485 F.3d 904 (6th Cir. 2007)

*United States v. Peterson*, 83 Fed.App'x. 150 (8th Cir. 2003) (appeals court reversed District

Court's downward departure based on the low likelihood for re-offense and susceptibility to

abuse in prison, as the first factor was already accounted for in the Guidelines and the second

factor was inapplicable to the facts of the case); *United States v. Goldberg*, 295 F.3d 1133 (10th

Cir. 2002) (defendant's lack of prior record, and low risk of recidivism are not valid grounds for

downward departure because those factors are all taken into account in the Guidelines

themselves). Strange's prior hands-on offenses distinguish him from the vast majority of federal

child pornography offenders who have no prior records at the time that they are sentenced. *U.S.*

*Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal*

*Criminal Justice System 320 (2011)* available at

http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/M
andatory_Minimum_Penalties/20111031_RtC_Mandatory_Minimum.cfm.

The defendant has demonstrated by his own conduct that he is a true sexual predator
whose criminal activity can only be stopped through incarceration. Strange only stopped his
child exploitation activities because he was arrested. The intervention of the juvenile justice
system provided Strange with many opportunities to stop his sexual abuse of children and to
benefit from services to conform his behavior to the law and gain empathy for victims. Despite
attending and completing sex offender treatment, he was not rehabilitated. Instead, he
entrenched himself in the online world of child sexual exploitation where he had unfettered
access to young boys he could manipulate and deceive into sexually gratifying him and his
cohort of sexual predators. Strange's history of sexual crimes against children and his conduct in
this case have earned him a sentence of 35 years' imprisonment to be followed by a lifetime
period of supervised release.

    3.   The seriousness of the offense, respect for the law, and just punishment

A significant term of imprisonment is required "to reflect the seriousness of the offense,
to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2).
These are serious offenses with lasting impact upon the victims. The sentence in this case must
promote respect for the laws that the defendant has broken, and must make him understand the
impact of his crimes. This can only be done by the imposition of a significant sentence of
incarceration. A 35-year sentence will adequately punish this defendant. He broke laws
designed to protect minors after engaging in hands-on sexual abuse of children. A 35-year
sentence to be followed by a lifetime period of supervised release has been well earned.

4. Deterrence

Deterrence is also a factor that calls for a significant sentence of incarceration. The defendant himself needs to be deterred from sexually exploiting children in the future. A 35-year sentence will accomplish this goal for at least as long as the defendant is incarcerated by removing him from society and preventing his access to children, whether in-person or online. Because even a lengthy sentence of 35 years will only protect children in the community from the defendant until he is in his fifties, the government requests this Court impose a lifetime period of supervised release to further deter the defendant from committing future crimes and to ensure that he is closely monitored once released into the community. Section 3553(a)(2) also mandates that the Court consider a sentence that adequately deters others who would commit similar offenses. The sentence in this case must give notice that the sexual exploitation of children has serious and significant consequences.

5. Consistency in Sentencing

The 35-year sentence sought by the government is consistent with sentences imposed in this District for similarly situated offenders who have committed similar crimes and have mental health diagnoses. In this District, defendants convicted of manufacturing child pornography typically receive sentences within or close to the recommended Guideline range. Offenders who engage in hands-on sexual abuse often receive life-equivalent sentences. *See, e.g., United States v. Zhinin* (17-383) (Smith, J.) (life sentence); *United States v. Maffei* (16-511) (Goldberg, J.) (statutory maximum sentence of 90 years' imprisonment); *United States v. Mazer* (12-546) (Dubois, J.) (defendant with Asperger's Syndrome sentenced to 720 months' imprisonment for producing child pornography of two toddlers during his sexual abuse of them).

Offenders who engage in online production of child pornography typically receive lower

sentences than those engaged in hands-on abuse, but these sentences are still frequently within or close to the sentencing Guideline range and well above the 15-year mandatory minimum, even for young adult defendants with documented mental health diagnoses. *See, e.g., United States v. Tyler Moury*, (21-433) (McHugh, J.) (sentence of 35 years' imposed where 24-year-old defendant suffering from traumatic brain injury enticed two teen girls to produce sexually explicit images online and produced images of one victim during a sexual encounter with her; guidelines of life imprisonment); *United States v. Connor* (19-57) (Sanchez, J.) (22-year-old defendant suffering from OCD and depression sentenced to 300 months' imprisonment followed by lifetime supervised release for coercing one 14-year-old victim online to produce sexually explicit images of herself and send them to him and maintaining a collection of images of child pornography from the Internet; sentencing guidelines called for life imprisonment); *United States v. Seibert* (17-572) (Leeson, J.) (Defendant suffering from major depression and ADD sentenced to 360 months' imprisonment followed by lifetime supervised release for coercing a 14-year-old and 12-year-old victim online to produce sexually explicit images of themselves and send them to him via the Internet; sentencing guidelines called for 360 months to life imprisonment); *United States v. Dahl* (14-382) (Bartle, J.) (Defendant suffering from anxiety, depression, and PTSD sentenced to 293 months' imprisonment followed by 20 years of supervised release for communicating over the Internet with two undercover agents whom he believed to be 15-year-old boys and attempting to entice them to manufacture child pornography; sentencing guidelines called for 121 to 151 months' imprisonment). *But see United States v. Shore* (17-502) (Savage, J.) (Defendant with ASD sentenced to 15 years' imprisonment followed by lifetime supervised release for sexually exploiting four teenage girls online).

The government submits that the defendant's crimes are significantly worse than the

- 31 -

"typical" online offender, including those in the cases described above, who still received very lengthy sentences. The defendant victimized a greater number of children than these offenders, was far more entrenched in the child exploitation community than most of these offenders, and engaged in this behavior after already sustaining juvenile adjudications for hands-on sex offenses and just one month after "successfully" completing sex offender treatment. For all these reasons, the defendant has earned a lengthy sentence of 35 years to be followed by a lifetime period of supervised release.

      6.  <u>Guideline Policy Statements Issued by the Sentencing Commission</u>

The sentence sought by the government also comports with the policy statements and studies conducted by the United States Sentencing Commission ("USSG"). In October 2021, the USSG published a report entitled Federal Sentencing of Child Pornography Production Offenses (hereinafter "Child Pornography Production Report"). *See*

www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2021/20211013_Production-CP.pdf. This report is a compilation of data from 2005 through 2019 for every offender convicted in the United States of the crime of production of child pornography. Importantly, the Sentencing Commission found that in the 15-year period studied, the long-term trend shows that "[C]ourts consistently sentence child pornography production offenders to lengthy sentences." *See Child Pornography Production Report* at 21. Indeed, in analyzing the bases for the Courts' imposition of such lengthy sentences, the Sentencing Commission recognized that "child pornography production offenses are serious crimes that memorialize the sexual abuse and exploitation of children." *Id.* at 54.

The Child Pornography Production Report analyzed a number of cases over the 15-year

study period, and determined "average" sentences imposed for production offenses.[13] The data showed that the "average" sentence increased in length for the most egregious of production offenders. The Commission found that courts imposed longer than average sentences when various factors were present in a case, many of which are also present in defendant Strange's case, including: the defendant's use of coercive tactics and enticements, *id.* at 48; the defendant's misrepresentation of his identity to commit the offense, *id.*; the defendant's engagement in non-production child pornography conduct, *id.* at 49, and the defendant's pattern of sexual exploitation of children, including his prior acts of hands-on abuses, *id.* at 50.

In short, the defendant's conduct is more egregious than the "average" online child exploitation offender, particularly in light of his history of committing hands-on offenses against a 6-year-old and a 14-year-old, and he has earned a 35-year sentence.

---

[13] The Report found that the average sentence imposed for all production crimes was 275 months' incarceration. *Id.* at 21-22. Importantly, the "average" sentencing numbers are based on data that inaccurately results in "average" sentences that are actually *lower* than the true average sentence. In calculating these averages, those defendants who received sentences of 470 months or greater (including life) were limited in the sentence average computations as just 470 months' incarceration. *See* Child Pornography Production Report at 21, FN 35. That means that those who received sentences greater that 470 months' incarceration were capped at just 470 months (39 years), ***thus creating an inaccurate "average" sentence that is lower than the true average sentence imposed for these most egregious crimes.***

Though the Report shows that 57% of the sentences represented downward variances from the applicable sentencing Guideline range, more than 20% of that number was based on government-sponsored downward variances. *Id.* at 22. In other words, only a little over one-third of the cases involved downward variances granted by the Court without the prosecutor's motion. A recent study ordered by another Court in this district revealed similar results for the EDPA: downward variances were imposed in only 36% of the cases on the Court's own motion. The majority of the EDPA sentences for § 2251 offenses remain within the calculated Guideline ranges. **Significantly, in 16% of the EDPA cases, a sentence of life or life-equivalent incarceration was imposed, even when the offender had pleaded guilty and had no prior criminal history.**

As noted above, for many of these offenders, the calculated Guideline range is life imprisonment, so that even a sentence that represents a "downward variance" still results in decades in prison.

7.   Other considerations

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner… ." § 3553(a)(2)(D).  The defendant can and should receive sex offender treatment and mental health services while serving his federal prison sentence and while on his eventual term of supervised release.

8.   Restitution and Financial Penalties

Restitution is mandatory pursuant to 18 U.S.C. § 2259; however, to date, the government has not received any restitution requests from victims identified in this case.  The government continues to work with some victims and their families to determine their actual and projected losses for the purpose of compiling restitution claims on their behalf.  The government has requested that the families submit any restitution claims by May 1, 2023.

Here, as the Court did with co-defendant Wolf, the government requests that the Court defer its determination on restitution until a date no more than 90 days after the defendant's sentencing because the victims' losses are not presently known to the government.  Under 18 U.S.C. § 3664(d)(5), if the victim's losses are not ascertainable before sentencing, the government or the probation officer is required to inform the Court, and the Court "shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." The overarching purpose of Section 3664—the procedural arm of the restitution scheme in Section 2259—is "to ensure that victims of crime receive full restitution."  *Dolan v. United States*, 560 U.S. 605, 612 (2010).  In *Dolan*, the Supreme Court determined that the statute's "effort[] to secure speedy determination of restitution is *primarily* designed to help victims of crime secure prompt restitution rather than provide defendants with certainty as to the amount of

their liability." *Id.* at 613.  Construing the 90 days so as to limit the victim's ability to recover

statutorily mandated restitution would subvert the statute's principal objective.  *See id.* at 613

("to read the statute as depriving the sentencing court of the power to order restitution would

harm those—the victims of crime—who likely bear no responsibility for the deadline's being

missed and whom the statute also seeks to benefit").  Noting that failure to comply with this 90-

day directive carries with it no statutory consequences, the Supreme Court held that when, as

here, a defendant is aware of the existence of mandatory restitution and the court's intention to

address it at a later date, exceeding the 90-day period does not deprive the court of jurisdiction to

order mandatory restitution.  *See id.* at 615 (where defendant knows that restitution is mandatory

prior to expiration of 90-day period, missing statutory hearing date does not invalidate hearing).

Consequently, where the government seeks a continuance within the 90 days for the benefit of

the victims of the defendant's crimes, granting such request is appropriate and falls squarely

within the situation contemplated by the statute.

Deferring restitution in this case would serve the statute's purpose of ensuring the victims

receive full restitution for their losses.  A deferral will also enable this Court to consider

restitution orders against both defendants at the same time.

The defendant is subject to the Justice for Victims of Trafficking Act (JVTA), and to the

provisions of the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018

(AVAA).  Based on the defendant's financial information, the government agrees that he is

indigent for the purposes of these assessments and, therefore, does not request that the Court

impose any assessments under these statutes.

## V.    CONCLUSION

For the reasons set forth above, the appropriate considerations of sentencing favor the

imposition of a 35-year sentence to be followed by a lifetime period of supervised release.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*/s/ Kelly Harrell*
KELLY HARRELL
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing

Government's Sentencing Memorandum to be served by email upon counsel for defendant:

Barnaby Wittels, Esq.
barnabywttls239@gmail.com

*/s/ Kelly Harrell*
KELLY HARRELL
Assistant United States Attorney

Date:  March 24, 2023